IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DANIEL J. SPENCER,         )
                                 )
              Plaintiff,        )     2:13-cv-1282
      v.                      )
                                 )     **Electronic Filing**
PENNSYLVANIA STATE POLICE,   )
                                 )
             Defendants.    )

## OPINION

Plaintiff Daniel J. Spencer filed this civil action against the Pennsylvania State Police ("PSP") after PSP determined that Plaintiff was medically unfit to enter its academy and removed his name from its list of eligible cadets. Plaintiff alleges that PSP's actions violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. §794 ("Rehabilitation Act"). This court has subject matter jurisdiction over the case pursuant to 28 U.S.C. §1331.

Presently pending before the court is PSP's motion for summary judgment on the Rehabilitation Act claim. For the reasons that follow, PSP's motion will be denied.

### I.    Background[1]

The process to become a PSP cadet and eventually, if successful, a Pennsylvania state trooper, involves numerous steps. (DSMF ¶2.) [2] The first step involves an on-line application to the State Police Academy (the "Academy"). (DSMF ¶3.) If the applicant is deemed qualified to

---

[1] The factual background is derived from the undisputed evidence of record and the disputed evidence of record viewed in the light most favorable to Plaintiff, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[2] References to "DSMF" refers to the Defendant's Concise Statement of Undisputed Material Facts (ECF No. 27) and Plaintiff's responses thereto (ECF No. 32). References to "PSMF" refers to the Plaintiff's Statement of Material Facts (ECF No. 33) and Defendant's responses thereto (ECF No. 37). Where appropriate, the court also refers to other documents and evidence of record.

continue, a written test is administered.  (DSMF ¶4.)  If successful on the written test, the

applicant takes an oral test.  If the applicant passes the oral test, he or she must then successfully

pass a "physical readiness" test.  (Id.)  This is followed by a polygraph test and a background

check.  (Id.)  If the applicant passes these stages, he or she must undergo a medical and

psychiatric evaluation.  (Id.)  Finally, a second physical readiness test is performed prior to the

beginning of an intensive training course at the Academy.  (Id.)

Applicants who are accepted into the program at the Academy undergo a 28-week

training program with multiple components as set forth in the manual entitled "Pennsylvania

State Police Cadet Physical Training Requirements."  (DSMF ¶5.)  If a cadet applicant

successfully completes the six months of academic and physical training at the Academy, he or

she then becomes a "probationary trooper" and must complete a 12-month hands-on

probationary period.  (DSMF ¶6.)

During this twelve-month period, the probationary trooper is assigned a coach in a troop

setting.  (Decl. of Kim Hershey Studenroth, ECF No. 29-13.)  The probationary trooper receives

extensive field training, during which time he or she must perform all of the full duties required

of a Pennsylvania state trooper.  (Id.)  The probationary trooper is subjected to frequent

assessments and evaluations, which inform PSP's determination as to whether the probationary

trooper meets the standards required of a full-time state trooper.  (Id.)

At the end of the probationary period, the candidate's evaluations are sent to PSP's

Probationary Review Panel, which makes a recommendation to either retain the probationary

trooper to full-time trooper status or seek further review at a higher level of authority.  (DSMF

¶8.)  The Commissioner of PSP makes the final determination to dismiss an individual or retain

them to full Trooper status.  (DSMF ¶9; Studenroth Decl., ECF No. 29-13.)

Plaintiff, who has a history of ulcerative colitis, was an applicant for a position as a PSP cadet between 2010 and 2011. (DSMF ¶1; Pl.'s Ex. 16, ECF No. 34-3.) During this time, Plaintiff successfully passed PSP's written and oral exams, as well as the initial physical readiness test, the polygraph test, and PSP's background check. (PSMF ¶3.) After successfully completing these phases of the application process, Plaintiff received correspondence from Kim Studenroth, PSP's Bureau of Human Resources Director, advising that, "[i]n order to receive a bona fide offer of employment," he would have to "successfully complete the remaining Cadet selection procedures," – including a medical and psychological evaluation. (Pl.'s Ex. 5, ECF No. 34-2.)

Dr. Michael Marrone was the PSP Medical Officer in 2011 and in that capacity was responsible for determining the medical eligibility of PSP cadet applicants. (DSMF ¶11.) He also had a private practice of medicine specializing in family practice, occupational medicine, and internal medicine. (Id.) In his private practice, Dr. Marrone had treated numerous patients who had ulcerative colitis. (DSMF ¶12.)

On October 14, 2011, Plaintiff reported to Dr. Marrone for his medical evaluation. (DSMF ¶10.) At that time, Plaintiff reported a flare up of his ulcerative colitis which had started approximately 6 to 8 weeks prior, for which he was still taking Prednisone. (DSMF ¶¶ 13, 14; Spencer Dep. 75:21-76:4, ECF No. 34-1.) Dr. Marrone also learned that Plaintiff had previously undergone a colonoscopy in connection with his ulcerative colitis. (DSMF ¶18.) Based on this information, Dr. Marrone requested medical records from Plaintiff's physicians concerning his condition, including any blood tests, colonoscopy reports, and other lab data. (DSMF ¶¶ 15, 18.)

Dr. Marrone subsequently received medical records from Plaintiff's treating gastroenterologist, as well as laboratory test results and the colonoscopy report. (DSMF ¶19.)

The records showed that Plaintiff had undergone a colonoscopy on July 30, 2010, which revealed active ulcerative colitis. (DSMF ¶15; Pl.'s Ex. 9, ECF No. 34-3.) Tissue samples taken at the time of the colonoscopy revealed chronic inflammation of the mucosa. (DSMF ¶21, Pl.'s Ex. 9, ECF No. 34-3.) In addition, the records documented that Plaintiff had been suffering from anemia as a result of the ulcerative colitis and bleeding. (DSMF ¶¶ 15, 20.) Dr. Marrone learned from reports of Plaintiff's medical history that Plaintiff had been diagnosed with ulcerative colitis approximately two years prior and, during that two-year period, he had experienced at least three flare-ups for which Plaintiff had been placed on prolonged courses of Prednisone. (DSMF ¶16.) Based on the results of Plaintiff's blood tests, Dr. Marrone determined that Plaintiff's medications had not put him into remission. (DSMF ¶ 22.) Moreover, based on Plaintiff's continued use of Prednisone and his own review of the medical records, Dr. Marrone concluded that Plaintiff's ulcerative colitis was in an active state. (DSMF ¶ 22; Marrone Dep. at 22:6-23, ECF No. 34-1.) Dr. Marrone further concluded that Plaintiff's medical condition rendered him unfit for cadet training and, pursuant to PSP policy, he reported his conclusions to PSP's human resources department. (Marrone Dep. 15:13-22, 16:10-14, 18:5-16.)

In circumstances when PSP's Medical Officer evaluates an applicant and concludes that the applicant has a medical condition that may preclude him or her from continuing through cadet training, the applicant can request that a Medical Review Board hear the Medical Officer's evaluation and review the applicant's condition. (DSMF ¶25.) After conducting a hearing, the Medical Review Board then determines, under the direction of PSP's Bureau of Human Resources Director, whether the applicant should remain on the cadet eligibility list. (Id.)

On November 15, 2011, Dr. Marrone met with PSP's Medical Review Board to discuss Plaintiff's situation. (DSMF ¶19.) The Board consisted of three PSP officials, including PSP's

Board of Human Resources Director, Studenroth. (DSMF ¶26.) In preparation for that meeting, Dr. Marrone generated a one-page report documenting his opinion that Plaintiff was medically unfit for cadet training. (Marrone Dep. at 20:13-15.) Dr. Marrone commented on Plaintiff's history of ulcerative colitis as follows:

> … This is a chronic inflammatory disease of the rectum and colon which is characterized by remissions and exacerbations. The only known cure at this time is surgical excision of the rectum with total colectomy (removal of the entire colon). Following my evaluation, I sent for and received all of the medical records pertaining to this applicants [sic] "colitis". I carefully reviewed these records and learned that his inflammatory bowel disease is still active. His last colonoscopy of 07/30/2010 demonstrated the presence of this disease in the rectum and adjoining colon as evidence by diffuse ulceration of the mucosal lining of these structures and the presence of bleeding. This cadet also gave me a history of having had several flare-ups which included diarrhea and rectal bleeding. His last flare-up, he stated, was 6 weeks prior to my evaluation. At the time of my evaluation, he was still taking medication to treat this flare-up.

> Because of the nature of this disease, characterized by recurrent bouts which could render him compromised and unable to perform critical job functions, I am of the opinion that this candidate is medically unacceptable and should not be admitted to the cadet training program of the Pennsylvania State Police.

(Pl.'s Ex. 6, ECF No. 34-2; Pl.'s Ex. 17, ECF No. 34-3.)

During his meeting with the Medical Review Board, Dr. Marrone discussed and explained his evaluation of Plaintiff's medical condition. (DSMF ¶28.) In particular, Dr. Marrone reviewed medical records from Plaintiff's treating gastroenterologist as well as Plaintiff's pathology and laboratory reports and provided these records to the Board. (DSMF ¶¶ 29, 30, 36.) Dr. Marrone opined that Plaintiff's ulcerative colitis, when active or flaring up, could cause abdominal cramping and flank pain, and could also cause Plaintiff to experience loose and frequent stools with blood present as well as anemia which, in turn, could result in weakness, reduced exercise tolerance, shortness of breath, and even fainting. (DSMF ¶37.) Dr. Marrone opined that Plaintiff was experiencing active ulcerative colitis at the time of his medical evaluation in October 2011, which had been ongoing for six weeks prior despite Plaintiff's use of

. (Id.)  Dr. Marrone admits, however, that he did not inform the Board as to how Plaintiff's

colitis was actually affecting his body, because he had no way of knowing that.  (Marrone Dep.

24:2-7.)

Dr. Marrone also discussed with the Medical Review Board the essential job functions of

a Pennsylvania state trooper in light of Plaintiff's medical condition at the time of his evaluation.

(DSMF ¶38.)  Dr. Marrone opined that Plaintiff would be unable to perform numerous essential

job functions while his ulcerative colitis remained in an active state, including making forcible

arrests, pursuing fleeing suspects on foot, performing rescue operations, quickly entering and

exiting vehicles, lifting, carrying and dragging heavy objects, climbing through openings and

crawling in confined spaces.  (DSMF ¶¶ 41-42, 45.)  Dr. Marrone also felt that Plaintiff's ability

to make quick and focused decisions in stressful situations where immediate action was needed,

such as the decision whether or not to use deadly force, could be impaired and create a safety

issue if he were experiencing the immediate effects of active ulcerative colitis such as cramping,

flank pain, explosive diarrhea, and weakness.  (DSMF ¶43.)  Similarly, Dr. Marrone opined that

the effects of active ulcerative colitis would compromise an individual's ability to engage in long

periods of surveillance, possibly in a vehicle, and to remain alert and focused.  (DSMF ¶44.)  Dr.

Marrone also felt that active ulcerative colitis symptoms would impair a trooper's ability to

demonstrate appropriate tolerance in antagonistic environments.  (Marrone Dep. at 26:9-27:6.)

Finally, Dr. Marrone advised the Board that Plaintiff's anemia and impaired vision were factors

that would independently disqualify him from entry into the Academy.  (DSMF ¶47; Marrone

Dep. 64:23-65:10, 67:9-19, 67:24-68:4.)

Following their meeting with Dr. Marrone, the Medical Review Board convened

separately outside of his presence to discuss the essential job functions of a state trooper in

connection with their review of Plaintiff's application. (DSMF ¶ 49.) The Board agreed that active ulcerative colitis would prevent Plaintiff from satisfactorily performing numerous essential job duties and would also present a safety concern if Plaintiff needed to use the bathroom urgently and frequently in situations involving arrests, rescues, or administration of first aid. (DSMF ¶50.)

On November 17, 2011, the Medical Review Board issued a decision accepting Dr. Marrone's medical opinion and stating that "Cadet applicant has a disease that is currently being treated for a flare up that renders him unable to meet [and] perform the critical job functions/essential job functions required of a PSP Trooper." (Pl.'s Ex. 14, ECF No. 34-3.) The following day, Studenroth sent correspondence to Plaintiff advising him that his name had been removed from PSP's list of eligible cadets. (Pl.'s Ex. 13, ECF No. 34-3.) The letter stated that:

> [t]he Department is precluded from permanently disqualifying you as an applicant
> for the position of State Police Cadet. You may reapply to participate in the next
> written examination; however, the disqualification factor(s) that precluded your
> employment with the Department at this time may continue to preclude your
> hiring in the future. ..."

(Id.)

Plaintiff declined to reapply for admission to PSP's Academy. Instead, he filed a one-count complaint alleging that PSP's actions violated § 504 of the Rehabilitation Act. PSP filed its motion for summary judgment and supporting materials (ECF Nos. 25, 26, 27, 28, and 29) on December 16 and 17, 2014. Plaintiff filed his brief and other materials in opposition to the motion (ECF Nos. 31, 32, 33, and 34) on January 20, 2015. PSP filed its reply to Plaintiff's Concise Statement of Material Undisputed Facts (ECF No. 37) and supplemental appendix (ECF

No. 38) on February 17, 2015.  As a result of the foregoing, the relevant issues have been adequately joined by the parties and Defendant's motion is ripe for disposition.

## II.    Standard of Review

Summary judgment is appropriate only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Melrose, Inc. v. Pittsburgh,* 613 F.3d 380, 387 (3d Cir. 2010).  Issues of fact are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986); *see also McGreevy v. Stroup,* 413 F.3d 359, 363 (3d Cir. 2005).  Material facts are those that will affect the outcome of the trial under governing law.  *Anderson,* 477 U.S. at 248.  The Court's role is "not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party."  *American Eagle Outfitters v. Lyle & Scott Ltd.,* 584 F.3d 575, 581 (3d Cir. 2009).  "In making this determination, 'a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor.'"  *Farrell v. Planters Lifesavers Co*., 206 F.3d 271, 278 (3d Cir. 2000) (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

The moving party bears the initial responsibility of stating the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  If the moving party meets this burden, the party opposing summary judgment "may not rest upon the mere allegation or denials," but "must set forth specific facts showing that there is a genuine issue for trial." *Saldana v. Kmart Corp.,* 260 F.3d 288, 232 (3d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 n.11 (1986)).  "For an issue to be genuine, the

nonmovant needs to supply more than a scintilla of evidence in support of its position – there must be sufficient evidence (not mere allegations) for a reasonable jury to find for the nonmovant." *Coolspring Stone Supply, Inc. v. American States Life Ins. Co.,* 10 F.3d 144, 148 (3d Cir. 1993).

## III.    Discussion

Section 504(a) of the Rehabilitation Act provides, in relevant part, that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance..." 29 U.S.C. § 794(a).[3]  In order to establish a *prima facie* case of employment discrimination under §504, the plaintiff must produce evidence demonstrating: "'(1) that he or she has a disability[;] (2) that he or she is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) that he or she was nonetheless terminated or otherwise prevented from performing the job.'" *George v. Allegheny Cty. of PA,* 581 F. App'x 138, 140 (3d Cir. 2014) (quoting *Shiring v. Runy*on, 90 F.3d 827, 831 (3d Cir. 1996))(alteration in the original).

For purposes of the pending motion, PSP challenges only the second element of Plaintiff's *prima facie* case – i.e., whether Plaintiff is a "qualified individual." *See* 42 U.S.C. §12111(8) (defining a "qualified individual" as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such

---

[3] "The Rehabilitation Act expressly makes the standards set forth in the 1990 Americans with Disabilities Act, 42 U.S.C. § 12101 et seq., applicable to federal employers and to employers receiving federal funding." *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir.2007) (citing 29 U.S.C. § 791(g), currently re-designated as §791(d)). Thus, the requirements for claims under the ADA and the Rehabilitation Act are identical. *See Coleman v. Pennsylvania State Police,* 561 F. App'x 138, 143 (3d Cir. 2014) ("The standards used to determine whether the [Rehabilitation] Act has been violated are the same standards applied under the ADA.") (citing 29 U.S.C. §794(d) and *Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002)).

individual holds or desires"). Determining whether a plaintiff is a "qualified individual" involves consideration of two factors: "'(1) whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought, and (2) whether the individual, with or without reasonable accommodation, can perform the essential functions of that position.'" *Seeney v. Pennsylvania, Dept. of Corrections, SCI-Graterford,* 31 F. Supp. 3d 677, 681 (E.D. Pa. 2014) (quoting *Turner v. Hershey Chocolate USA*, 440 F.3d 604, 611 (3d Cir. 2006)); *see also* 29 C.F.R. § 1630.2(m)). This determination is made at the time of the employment decision, not at the time of the lawsuit. *Seeney,* 31 F. Supp. 3d at 681 (citing *Turner,* 440 F. 3d at 611).

Here, PSP challenges both parts of the "qualified individual" inquiry. To the extent Plaintiff's claim is premised on PSP's failure to hire him as a state trooper, PSP argues that Plaintiff lacked the requisite skill, experience, education and other job-related requirements of the position inasmuch as he did not complete cadet training. In addition, however, PSP contends that Plaintiff's medical condition made him incapable of otherwise performing the essential functions of the cadet or trooper position, with or without an accommodation. Moreover, PSP maintains that no reasonable accommodation exists in Plaintiff's case, other than an assignment to light duty work, which is not available to PSP cadets.

Plaintiff, on the other hand, contends that a reasonable jury could find him "qualified" for both the cadet and trooper positions. He argues that he possesses the requisite skill, experience, education, and other job-related requirements necessary to be a cadet by virtue of the fact that, during the applications process, he passed the requisite written examination, oral examination, physical readiness test, polygraph test, and background investigation. As for part two of the "qualified individual" inquiry, Plaintiff argues that a jury could find him capable of performing

the essential functions of the cadet position, with or without an accommodation, notwithstanding his ulcerative colitis. Plaintiff argues that all of Dr. Marrone's statements to the contrary are based entirely on assumptions and generalizations about ulcerative colitis without consideration as to how the disease affected him personally. Because the essential job functions of a PSP trooper are the same as those of a cadet (*see* DSMF ¶51), Plaintiff argues that he is also qualified to perform the essential functions of a PSP trooper, and that the only reason he failed to complete the requisite cadet training was because PSP took him off the eligibility list in violation of the Rehabilitation Act. Plaintiff also maintains that PSP failed to engage in an "interactive process" with him in order to determine an appropriate accommodation.

The court will first consider whether Plaintiff has adduced evidence sufficient to support a reasonable finding that he is capable of performing the essential functions of a PSP cadet, either with or without accommodation. As Defendant acknowledges, Studenroth and the Medical Review Board determined that Plaintiff was incapable of performing the essential functions of a PSP cadet and trooper by virtue of his ulcerative colitis and related symptoms. In addition, Studenroth and the Board concluded that Plaintiff's medical condition presented a direct threat to the health and safety of the public, to other officers, and to Plaintiff himself. (*See* Def.'s Br. Supp. Mot. Summ. J. at 15, ECF No. 26.)

In essence, the parties' dispute in this case centers around PSP's use of a qualification standard to screen out cadets candidates that it deems unfit for the job. *See* 42 U.S.C. §12112(b)(6) (noting that "discriminat[ion] against a qualified individual on the basis of a disability" under the ADA includes an employer's use of "qualification standards ... or other selection criteria that screen out or tend to screen out an individual with a disability"). More specifically, the parties dispute the extent to which Plaintiff's ulcerative colitis and any

associated symptoms rendered him medically unfit for the position of PSP cadet and trooper. *See* 29 C.F.R. §1630.2(q) (defining "qualification standard" to include "the personal and professional attributes including the ... physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired").

Notably, employers may assert a defense to a charge of disability-related discrimination in cases where the relevant qualification standard is shown to be "job-related and consistent with business necessity," and where successful job performance "cannot be accomplished by reasonable accommodation." 42 U.S.C. §12113(a). "Qualification standards" may include a "requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." Id. §12113(b). A "direct threat" is defined by the pertinent regulations as "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation." 29 C.F.R. § 1630.2(r); 42 U.S.C. § 12111(3). "The key inquiry when considering whether an applicant or employee poses a direct threat is 'not ... whether a risk exists, but whether it is significant.'" *Bender v. Norfolk Southern Corp.,* 994 F. Supp. 2d 593, 610 (M.D. Pa. 2014)(quoting *Bragdon v. Abbott*, 524 U.S. 624, 641 (1998)). Moreover:

> [t]he determination that an individual poses a "direct threat" shall be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job. This assessment shall be based on a reasonable medical judgment that relies on the most current medical knowledge and/or on the best available objective evidence. In determining whether an individual would pose a direct threat, the factors to be considered include:
>
> (1) The duration of the risk;
>
> (2) The nature and severity of the potential harm;
>
> (3) The likelihood that the potential harm will occur; and

(4) The imminence of the potential harm.

29 C.F.R. § 1630.2(r).

Here, the Court finds that genuinely disputed issues exist in the record concerning whether Plaintiff was qualified for the position of PSP cadet and trooper, even without an accommodation, and/or whether his medical condition presented a significant risk of substantial harm to himself and others so as to constitute a "direct threat" within the meaning of the controlling regulations. Consequently, the Court finds that summary judgment is not appropriate.

As an initial point, the Court agrees with Plaintiff that a jury could reasonably conclude he satisfied the first element of the "qualified individual" inquiry relative to the cadet position. Since Plaintiff passed all requisite phases of the application process up to the point of his medical evaluation, a jury could fairly infer that he was otherwise qualified for cadet training in terms of his skill, experience, education and other job-related requirements of the position.

With respect to the second part of the "qualified individual" inquiry, the Court finds that there are triable issues of fact as to whether Plaintiff was capable of performing the essential functions of a cadet, even without an accommodation for his ulcerative colitis.[4] Plaintiff has

---

[4] Under *Deane v. Pocono Med. Ctr.*, 142 F.3d 138 (3d Cir. 1998), the second inquiry of the "qualified individual" test – *i.e.*, whether the individual, with or without reasonable accommodation, can perform the essential functions of the position in question – is itself a two-part process:

> First, a court must consider whether the individual can perform the essential functions of the job without accommodation. If so, the individual is qualified (and, *a fortiori*, is not entitled to accommodation). If not, then a court must look to whether the individual can perform the essential functions of the job with a reasonable accommodation. [ ] If so, the individual is qualified. If not, the individual has failed to set out a necessary element of the *prima facie* case.

142 F.3d at 146 (internal footnote omitted). Plaintiff contends that a jury could find PSP failed to engage in an interactive process with him in good faith so as to discover a reasonable accommodation, *see Mengine v. Runyon,* 114 F.3d 415, 420-21 (3d Cir. 1997); however, under the principles set forth in *Deane,* the Court need not undertake this line of inquiry at the present time. Because the record here reveals triable issues of fact as to whether Plaintiff could perform the essential job functions of a cadet even *without* an accommodation, Plaintiff need not prove, and

produced evidence which, if credited by a jury, could support a reasonable inference that Dr. Marrone exaggerated the extent to which Plaintiff's medical condition would have likely inhibited his performance of essential job functions. Plaintiff testified that his symptoms from ulcerative colitis were most severe around the time he was first diagnosed in March of 2010 and before he began his course of treatment; at that time, his symptoms included a frequent urge to defecate, occasional stomach pain, bloody stools, and some weakness and fatigue. (Spencer Dep. 33:4-19, 37:23-38:22, ECF No. 34-1; *see* Def.'s Ex. 17 and 21, ECF No. 38-1.) However, Plaintiff also offered testimony suggesting that his ultcerative colitis improved over time with treatment, to the point that he is no longer symptomatic. (Spencer Dep. 23:16-25, 31:17-33:19, 66:1-10, 67:24-68:6.) He claims that, when he feeling ill from the condition, his only symptom would typically involve "just a frequency in going to the bathroom." (Spencer Dep. 32:25-33:3.) Despite experiencing some weakness and fatigue at the time of initial onset, Plaintiff did not experience shortness of breath at that time and he was not impaired in performing any of his usual activities. (Spencer Dep. 39:6-40:6.) In fact, at no time during his course of treatment has Plaintiff been restricted from performing any particular activity. (Spencer Dep.47:2-10.) He is able to go to the gym 3 times a week and perform weight training and cardio exercises. (Spencer Dep. 69:17-70:10.) Furthermore, as part of his PSP physical readiness test, which he passed, Plaintiff was required to perform: a vertical jump of at least 14 inches; a 23.5 second Illinois Agility run; a 77 second 300 meter run; 13 push-ups; and a 17 minute, 48 second 1.5 mile run. (Pl.'s Ex. 4, ECF No. 34-2.) When Plaintiff experienced his most recent flare up, approximately 6 to 8 weeks before his meeting with Dr. Marrone, his symptoms did not result in Plaintiff missing any work from the job he was then working. (Spencer Dep. 75:21-76:4, 77:25-78:3;

this Court need not presently consider, whether he could also perform those essential job functions with the benefit of an accommodation.

Pl.'s Ex. 7, ECF No. 34-2; Marrone Dep. 83-45.)  Collectively, this evidence tends to support an inference that Plaintiff's symptomatology did not significantly impair his physical abilities or work performance.

In addition, certain aspects of the medical record permit competing inferences regarding the seriousness of Plaintiff's ulcerative colitis, the extent to which it was well-controlled with medication, and the extent to which it would likely impair Plaintiff's ability to perform essential job functions.  Dr. Marrone believed that Plaintiff suffered from significant, active ulcerative colitis, based largely on Plaintiff's lab results and the July 2010 colonoscopy, which was performed some 15 months prior to Plaintiff's medical evaluation.  (Marrone Dep. at 43:15-44:7; 116:12-14.)  However, while Dr. Marrone believed the colonoscopy indicated "significant" ulcerative colitis, Plaintiff's treating gastroenterologists interpreted the study as evidence of "mild" distal colitis, while Plaintiff's consulting gastroenterologist found evidence of a "mildly-active pan ulcerative colitis."  (Marrone Dep. 21:14-17; 33:17-21; Pl.'s Ex. 9 at p.3, ECF No. 34-3; Def.'s Ex. 18 and 19, ECF No. 38-1; D. Ex. 20, ECF No. 38-1.)  The consulting gastroenterologist, Dr. Miguel Regueiro, evaluated Plaintiff in March of 2011 after Plaintiff had reported a flare-up the previous January involving frequent diarrhea, nocturnal bowel movements, urgency and bleeding. With that flare up, Plaintiff started a course of Prednisone, Asacol, and Canasa suppository.  (Def.'s Ex. 20, ECF No. 38-1.)  As of March 2011, Plaintiff was reporting fairly normal symptoms with only one bowel movement a day, and Dr. Regueiro reported that Plaintiff was actually doing quite well with his medications.  (Def.'s Ex. 20, ECF No. 38-1.)  Plaintiff reported another flare up of his ulcerative colitis approximately 6 to 8 weeks prior to his appointment with Dr. Marrone, involving loose and frequent stools with blood present.  (Pl.'s Ex. 7, ECF No. 34-2.)  However, as of September 27, 2011 (just two and a half

weeks prior to his evaluation by Dr. Marrone), Plaintiff's treating physician reported that Plaintiff's ulcerative colitis was "well controlled with medications," and his rectal and anal examination were normal. (Pl.'s Ex. 8, ECF No. 34-2.) Dr. Marrone also believed that Plaintiff's lab results were indicative of significant anemia which, in turn, evidenced an active state of ulcerative colitis. (Marrone Dep. 33:17-3434:8; 43:18-21.) However, it appears that the most recent lab report in the record was a report from a blood draw taken on April 28, 2011, approximately six months prior to Plaintiff's medical evaluation, and Dr. Marrone agreed this report showed only "very mild anemia." (Marrone Dep. 105:12-106:5; Def.'s Ex. 22, ECF No. 38-1.)

Plaintiff has also produced evidence from which a jury could reasonably infer that Dr. Marrone based his medical opinion, at least in part, on generalized assumptions about Plaintiff's disease, rather than on an individualized assessment of Plaintiff's actual symptomatology and capability to perform various job functions. *See, e.g. School Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 (1987) (noting that "an individualized inquiry … is essential if §504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks"). For example, Dr. Marrone felt that Plaintiff's anemia was independently a disqualifying medical condition, and he told the Medical Board that Plaintiff's anemia might result in certain physical side-effects, including weakness, reduced exercise tolerance, shortness of breath with minimal exertion, and (in severe cases) lightheadedness or fainting (Marrone Dep. 67:9-20, 37:8-14); however, Plaintiff did not report having these symptoms, and Dr. Marrone admitted there was nothing in the medical records to suggest that Plaintiff was experiencing these types of symptoms. (Id. at 49:7-10,

37:18-20.) Moreover, Dr. Marrone admitted that he had no way of personally knowing whether Plaintiff was experiencing any of these symptoms. (Marrone Dep. at 37:15-17.) Similarly, Dr. Marrone felt that Plaintiff's high dose of Prednisone was an independently disqualifying factor (Marrone Dep. 65:3-8), and there is testimony suggesting he advised the Board about the potential negative side effects that can occur with high doses of Prednisone (*id*. at 56:19-57:13),[5] such as muscle wasting, swelling of the limbs, gastric bleeding, and "frank Prednisone psychosis." Dr. Marrone also admitted, however, that there was no way to predict whether Plaintiff would likely experience those negative side effects. (Id. at 56:19-57:13.)[6] Dr. Marrone also advised the Board that ulcerative colitis, when active, can produce a spectrum of symptoms such as abdominal cramping or flank pain, diarrhea, rectal bleeding, and incontinence; however, he did not advise the Board as to how Plaintiff's condition was specifically affecting his body or whether his medications were effective in controlling his symptoms, because he admittedly had no way of personally knowing that. (Marrone Dep. 23:17-24:20, 34:13-18, 36:16-21.) At the time of his medical evaluation at PSP, Plaintiff denied any particular problems or symptoms related to his ulcerative colitis and reported needing only 1 or 2 regular bathroom breaks per day. (Marrone Dep. 33:2-10, 49:7-10.) Marrone was suspicious of this and felt that Plaintiff was minimizing his symptoms, but he admitted it is possible for someone to have active colitis and be asymptomatic. (Id. at 21:1-11, 49:17-20.) Notably, Plaintiff's reports of needing only 1 or 2 regular bathroom breaks per day was consistent with Plaintiff's reports to his consulting and

---

[5] Dr. Marrone later equivocated about whether he in fact told the Board about the potential side effects of Prednisone (Marrone Dep. at 68:1-4); however for present purposes, we will view the record in the light most favorable to Plaintiff and assume that he did.

[6] There is also evidence in the record suggesting that Dr. Marrone mistook Plaintiff's dosage as 15 milligrams of Prednisone, when it was actually 5 milligrams. (Marrone Dep. at 32:2-20, 84:7-85:13; Spencer Dep. 75:7-15.)

treating gastroenterologists, in March 2011 and May 2011, respectively, that he was having 1 or 2 solid bowel movements daily. (Def.'s Ex. 20, ECF No. 38-1; Pl.'s Ex. 9 at p. 1, ECF no. 34-3.)

Based on the foregoing considerations, the Court concludes that genuinely disputed issues of fact exist on this record as to whether Plaintiff was capable of performing the essential job functions of a PSP cadet. The Court further concludes that there are genuinely disputed issues of fact relative to the applicability of the "direct threat" defense in this case. In particular, the record in this case gives rise to competing inferences about the significance of the risk that would have been posed by PSP accepting Plaintiff as into its cadet program in light of his history of ulcerative colitis and anemia. Reasonable factfinders might disagree, for example, in their conclusions about the likelihood of potential harm occurring if Plaintiff pursued training for trooper status, the imminence of such harm, the duration of the risk, and how these factors would affect the "direct threat" calculus in light of the nature and severity of potential harm that might occur. Thus, PSP has failed to establish, as a matter of law, that Plaintiff's admission into the Academy and training for trooper status would pose a "direct threat" of harm to himself and others.

The Court acknowledges that, even though PSP did not specifically disqualify Plaintiff from cadet status based on his visual acuity deficiency, PSP has represented that this deficiency would have been an independently disqualifying factor. The record shows that Plaintiff's vision, when uncorrected, was 20/200 in both eyes and, because of this, Plaintiff would have needed to undergo a surgical correction in order to be accepted into the Academy. (See Def.'s Ex. 9, ECF no. 29-8; DSMF ¶ 17.) Dr. Marrone admitted, however, that PSP "most definitely" allows candidates to undergo correctional surgery prior to entering the Academy. (Marrone Dep. at 65:17-19.) Accordingly, Dr. Marrone discussed Lasik and other corrective surgery options with

Plaintiff during his during his October 14, 2011 medical evaluation, but he advised Plaintiff to hold off on the surgery until it was determined whether he would otherwise pass his medical evaluation. (DSMF ¶17; Marrone Dep. 65:21-66:19.) After meeting with Dr. Marrone, but prior to receiving the results of his medical evaluation, Plaintiff became pre-qualified for Lasik surgery and was scheduled to have the surgery performed. (Spencer Dep. 79:10-24, ECF No. 34-1.) He delayed having it done, only because he was "waiting to hear back from the state police on whether or not [he] should move forward with it." (Id. at 79:21-24.) From this evidence, a jury could reasonably infer that Plaintiff's vision problems would not independently have prevented him from being accepted into PSP's Academy.

In sum, then, the Court finds that genuinely disputed issues of material fact exist on this record concerning whether Plaintiff was qualified to perform the essential functions of a PSP cadet, even without an accommodation for his ulcerative colitis, as of the date he was removed from PSP's list of eligible cadet candidates. PSP has not otherwise challenged Plaintiff's ability to make a *prima facie* showing that he was excluded from the Academy on the basis of disability-related discrimination. That being the case, PSP cannot establish that Plaintiff was unqualified for the position of state trooper as a matter of law merely because he failed to complete his cadet training. PSP also cannot establish, as a matter of law, that Plaintiff was unable to perform the essential job functions of a state trooper with or without an accommodation, because the record shows that the essential job functions for troopers were the same as the essential job functions of a cadet.

**IV.    Conclusion**

For the reasons stated above, the Defendants' motion for summary judgment will be denied.  An appropriate order follows.

Date: September 29, 2015

                                                    s/David Stewart Cercone
                                                    David Stewart Cercone
                                                    United States District Judge


cc:    Samuel J. Cordes, Esq.
       Christine T. Elzer, Esq.
       Jessica B. Michael, Esq.
       Thomas L. Donahoe, Esq.

       *(Via CM/ECF Electronic Mail)*